895 F.2d 1412
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
David ARNETT, Plaintiff-Appellant,
v.
MORTON SALT CO., A DIVISION OF MORTON THIOKOL, INC., a
Delaware Corporation, Defendant-Appellee.
 No. 89-1552.
 United States Court of Appeals, Sixth Circuit.
 Feb. 13, 1990.
 
 Before DAVID A. NELSON and BOGGS, Circuit Judges, and WILLIAM O. BERTELSMAN, District Judge.*
 PER CURIAM.
 
 
 1
 David Arnett appeals the district court's directed verdict for Morton Salt. Arnett claimed that, on the advice of his treating physician, he could only work if restricted to lifting less than 10 pounds. Arnett had been unable to work at Morton for a period of time because of this restriction, and Morton voluntarily paid him workers' compensation benefits. Arnett alleged that Morton returned him to a job which required him to lift more than this weight; Arnett refused this job and was fired.
 
 
 2
 Arnett claimed, inter alia, that the termination violated his right to choose his treating physician, and evidenced a conspiracy on the part of Morton to force him to return to work or stop collecting workers' compensation benefits. Following the presentation of Arnett's case at trial, Morton moved for a directed verdict, which the court granted. Arnett now appeals to this court, and we affirm.
 
 
 3
 * Arnett began his employment at Morton as a "palletizer", a job that required him to catch 40, 50, and 80-pound bags of salt as they dropped from the second to the first floor of the plant, and stack them on a pallet for shipping. After approximately one year at this job, he began work as an Automatic Bagger Operator, a job which again involved the repetitive handling of 40, 50, and 80-pound bags of salt.
 
 
 4
 In August 1983, Arnett injured his lower back while handling a 50-pound bag of salt. His treating physician diagnosed a back injury, and Arnett was given lighter duty, which he performed until he was bumped out of that position in late September 1983. Morton then began to pay him workers' compensation benefits voluntarily.
 
 
 5
 On October 20, 1983, Morton referred Arnett to Dr. J. Eric Zimmerman, a neurosurgeon, for treatment of back strain. Arnett's strain evolved into chronic low back disability. On April 16, 1984, Zimmerman told Morton's workers' compensation carrier, R.L. Kautz & Co., that Arnett could perform "... sedentary work, with sit/stand option, no more than 10 lbs. lifting and no repetitive work." Morton, however, could not find work for Arnett with these limitations, and continued him on workers' compensation benefits.
 
 
 6
 Kautz had Arnett examined by two other neurologists in 1984, neither of whom could find any objective neurological basis to explain Arnett's pain. In late 1984 and early 1985, one of these neurologists indicated that Arnett was physically capable of working as a fork lift operator and his former job as an Automatic Bagger Operator.
 
 
 7
 Based on this neurologist's report, Richard Sytek, Morton's personnel manager, and other Morton managers, discussed returning Arnett to the Automatic Bagger position. They decided, however, not to offer the job to Arnett because of the heavy lifting involved, and because work force changes could open up more appropriate opportunities. Morton continued to pay workers' compensation benefits voluntarily.
 
 
 8
 On April 29, 1985, Kautz sent Arnett to a third independent medical examiner, Dr. Robert Mahaney, an orthopedist. On this April 29 visit, Arnett apparently told Mahaney that he carried firewood into his house. He also described his pre-injury Automatic Bagger job. In his evaluation, Mahaney stated that:
 
 
 9
 I do not know how much the firewood weighed that he would carry in, perhaps somebody could answer that better that [sic] I could and see how close that is to 50 pounds, but personally I feel this patient could handle this [Automatic Bagger] job, but I think mentally he is not going to.
 
 
 10
 Morton, however, did not recall Arnett to the Bagger position following Arnett's visit to Mahaney, but continued him on workers' compensation benefits.
 
 
 11
 On June 17, 1985, Zimmerman reported on Arnett's condition, and a copy of the report was sent to Kautz. In part, it read:
 
 
 12
 I think [David] is going to be limited to sedentary work, sit/stand option, non-repetitive, 10 pound lifting limit. .... I will re-assess him in four months to evaluate the work restrictions, but I really doubt that these will change in the foreseeable future.
 
 
 13
 By a letter dated July 3, 1985, Dennis Hawkins, Kautz's Risk Management Officer, told Arnett that he now had sufficient seniority to "bump" into a lighter-duty Mill Janitor position, and that he must report to work on the 12:01 a.m. shift on July 8. Any difference between his pay rate as a Mill Janitor and his Automatic Bagger position would be paid by workers' compensation. Some days later, but prior to Arnett's return to work, Keith Rupert, Morton's Mill Superintendent, told Arnett that he should "take it cool and calm and do what he could do" on the Mill Janitor job.
 
 
 14
 Arnett reported to his Mill Janitor job on July 8, 1985 for the shift beginning at 12:01 a.m. Arnett indicated that he was under a 10-pound limit, although Arnett alleges that Luddie Ludwigson, his supervisor, insisted that he had a 50-pound restriction. Ludwigson apparently did not mention the basis for this 50-pound limit.
 
 
 15
 Arnett alleges that he strained his back that night. He reported the injury to Ludwigson, who told him to take it easy and do what he could do. At the conclusion of his shift, Arnett told mill foreman Arthur Nickleson that he was "a little sore" but had made it through the shift. Arnett alleges that, after this shift, he spoke with Zimmerman, who told him to request a 10-pound job.
 
 
 16
 On July 9, Arnett told Ludwigson of his 10-pound restriction. Ludwigson informed him that no 10-pound jobs existed at the plant, but told him to work at his own pace. Arnett then left the mill, stating that he would not work at a job which did not have a 10-pound limit. Arnett contends that if he had been given a job with a 10-pound limit, he would have stayed.
 
 
 17
 Later that day, Arnett attended a meeting with Morton representatives and a union representative. He told them that Zimmerman explicitly imposed a 10-pound weight restriction. Arnett alleges that Morton representatives told him (for the first time) about Mahaney's 50-pound restriction, and that they were accepting this limit. At no time, however, did any Morton supervisor tell him that he had to lift over 10 pounds. Arnett was informed at this meeting that he had to report to work within a week or be fired.
 
 
 18
 Another meeting was held later in the same week, one day before the expiration of the seven-day return period. Arnett again pointed to Zimmerman's 10-pound restriction. Morton told him that Zimmerman was no longer his doctor (apparently based on Zimmerman's letter of June 17, 1985, indicating a four-month hiatus in treatment), and that Mahaney had given him a 50-pound work restriction. Arnett refused to return to work and was fired on July 16, 1985. His pension benefits would have vested on October 7, 1985.
 
 
 19
 On July 18, 1985, Arnett filed a claim with the Michigan Employment Security Commission for workers' compensation benefits, stating that he had been returned to work in a job classification which required lifting in excess of his 10-pound restriction. In response, Morton's personnel manager, Richard Sytek, told the Michigan Employment Security Commission that "Mr. Arnett's medical limitation from Dr. Mahaney is not to lift more than 50 pounds" and "Mr. Arnett was assigned work as a Mill Janitor which required him to shovel more than 10 pounds." Arnett's claim for workers' compensation benefits was apparently still pending at the time of trial.
 
 
 20
 On January 7, 1986, Arnett filed a complaint under diversity jurisdiction against Morton, claiming, inter alia, that he was fired (or forced off his job) because he had a pending claim for workers' compensation benefits, in violation of the Michigan Workers' Disability Compensation Act. This claim proceeded to trial.
 
 
 21
 At trial, Arnett asserted that the Michigan Workers' Disability Compensation Act gave him the right to select his own treating physician and rely on that physician's advice. MCLA 418.315(1). According to Arnett, the alleged imposition of Mahaney's restriction (in lieu of Zimmerman's) and his subsequent termination represented an illegal interference with that right. MCLA 418.301(11). Arnett also asserted that Morton's actions constituted a conspiracy to deprive him of his right to workers' compensation benefits.
 
 
 22
 On March 14, 1989, at the conclusion of Arnett's case, Morton moved for a directed verdict. In part, Morton contended that Arnett presented no evidence of a pending claim (and thus could not have been terminated for filing one), that the Act did not create a right for employees to rely on their physician's advice on whether or not to return to work, and that even if such a right existed, the work offered was within the restriction. Morton also contended that Arnett had presented no evidence that it intended to deprive him of his right to workers' compensation benefits.
 
 
 23
 The court granted Morton's motion for a directed verdict on March 14. In particular, the court stated that Arnett's lack of a workers' compensation benefits claim prior to July 18, 1985 was fatal to his argument that he had been terminated for attempting to secure workers' compensation benefits. The court also noted that Arnett could not demonstrate that he had been forced off his job, since Morton told him to work at his own pace, and further that the opinion of two doctors (Mahaney and one of the neurologists) indicated that Arnett could perform the job assigned.
 
 
 24
 We find that the district court committed no error in granting Morton's motion for directed verdict. In resolving the issue of whether Morton violated Arnett's right to be treated by a physician of his choice, we need not reach the question of whether this provision binds Morton to follow Zimmerman's advice.
 
 
 25
 It is clear from the record that Morton did not disregard Arnett's purported 10-pound lifting restriction imposed by Zimmerman, despite Sytek's responses on Morton's filing with the Michigan Employment Security Commission. Arnett's supervisors told him to take it easy on his job. Arnett testified at trial that he felt in control of his job at all times, and could have requested assistance whenever necessary.
 
 
 26
 Morton never threatened to fire Arnett if he could not perform some of the more rigorous tasks attendant to his job. Indeed, Arnett quit of his own will, despite the statements of Morton that he should only do what he could. Thus, viewing the record in the light most favorable to Arnett, and giving him the benefit of all reasonable inferences, we find that the district court properly granted Morton's motion for a directed verdict.
 
 
 27
 Arnett also contends that Morton engaged in a conspiracy designed either to force him back to active employment or terminate employment and discontinue its payment of worker's compensation to him, in violation of MCLA 418.301(11). However, that statutory provision requires that Morton's actions be in response to Arnett's filing of a claim. In this case, Morton paid workers' compensation benefits voluntarily, and Arnett did not file such a claim until July 18, 1985. Thus, Arnett has no legal basis for maintaining his allegation that Morton violated MCLA 418.301(11).
 
 
 28
 We find that a reasonable jury, viewing the evidence in the light most favorable to Arnett, and giving him the benefit of all reasonable inferences, could not find that Morton's actions in bringing Arnett back to employment demonstrated any conspiracy to deprive him of a job or workers' compensation benefits. Thus, the district court's grant of a directed verdict as to this claim was not in error. Accordingly, the judgment of the district court is affirmed in all respects.
 
 
 
 *
 The Honorable William O. Bertelsman, United States District Judge for the Eastern District of Kentucky, sitting by designation